# State of New York Court of Appeals

MEMORANDUM

This memorandum is uncorrected and subject to revision before publication in the New York Reports.

No. 91
Dora Howell,
      Appellant,
    v.
City of New York, et al.,
      Respondents,
et al.,
      Defendant.

Beverley Gale Vanier, for appellant.
Devin Slack, for respondents.

MEMORANDUM:

The order of the Appellate Division should be affirmed, with costs.

Plaintiff's ex-boyfriend brutally attacked her and pushed her out of a third-floor window, in violation of an order of protection. For his crimes, the ex-boyfriend was

- 1 -

sentenced to a maximum of seven years in prison. Plaintiff commenced this negligence action against defendants City of New York and two police officers, alleging that they failed to provide her sufficient protection to prevent the assault.

This Court has, unfortunately, been asked to resolve many cases like this one, in which the plaintiff claims that "the police failed to protect [them] from injury inflicted by a third party" (*Ferreira v City of Binghamton*, 38 NY3d 298, 312 [2022]). Over the last several decades, this Court has established an approach to such cases that permits recovery against the government only in a narrow set of circumstances (*see generally id.* at 307-312).[1] Although typically applied to tragic facts befalling an individual, the special duty rule's purpose is to permit the government to protect its citizenry as a whole by allocating its resources in a manner that best promotes public welfare (*see McLean v City of New York*, 12 NY3d 194, 204 [2009]). Applying that well-settled analysis here, we conclude that the Appellate Division properly granted defendants' motion for summary judgment.

Defendants undisputedly were engaged in a governmental function—policing—when plaintiff's negligence claims arose (*see Applewhite v Accuhealth, Inc.*, 21 NY3d 420, 425 [2013]). Plaintiff was therefore required to prove that defendants owed her a special

---

[1] Despite our frequent reiteration that the special duty and governmental function immunity doctrines are separate principles, one dissent would, nevertheless, erroneously conclude that a special duty existed here based on the test applicable in the governmental function immunity context (*compare Ferreira*, 38 NY3d at 311 [a municipality is entitled to governmental function immunity if it "proves that the alleged negligent act or omission involved the exercise of discretionary authority" (internal citation omitted)], *with* Rivera, J., dissenting op at 22 ["an atomized assessment of each individual *Cuffy* factor is unnecessary because the factors are satisfied by the legislative abrogation of officer discretion"]).

duty of care as "an essential element" of her negligence claims (*Ferreira*, 38 NY3d at 310 [internal quotation marks omitted]).[2]

In response to defendants' prima facie showing on their summary judgment motion that they did not voluntarily assume a special duty in plaintiff's favor, plaintiff failed to raise a triable issue of fact. To establish a voluntarily assumed special duty, plaintiff was required to satisfy four well-settled elements:

> " '(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking' " (*id.* at 312-313, quoting *Cuffy v City of New York*, 69 NY2d 255, 260 [1987]).

Viewing the facts in the light most favorable to plaintiff (*see Vega v Restani Constr. Corp.*, 18 NY3d 499, 503 [2012]), she failed to raise a triable issue concerning the "critical" fourth element of an assumed special duty (*Valdez v City of New York*, 18 NY3d 69, 81 [2011] [internal quotation marks omitted]). Plaintiff testified during her deposition that she had no contact with the police on the day of the incident prior to the attack, that her ex-boyfriend was in fact at liberty that day, and that the officers never told her that her ex-boyfriend would be arrested for violating the order of protection. Plaintiff's own testimony

---

[2] While "a special duty can arise in three situations" (*Ferreira*, 38 NY3d at 310 [internal quotation marks omitted]), we address only the voluntary assumption of a duty circumstance here. Except Judge Wilson, we all agree that plaintiff's claim that defendants owed her a special duty pursuant to statute is unpreserved, and that plaintiff does not argue that such a duty existed because defendants took positive control of a known and dangerous safety condition (*see* Rivera, J., dissenting op at 18-19, 18 n 10).

demonstrates that she did not relax her vigilance based on any police promises that her ex-boyfriend would be arrested for violating the order of protection. It also shows that the police were not on the scene or in a position to provide assistance if necessary (*see Mastroianni v County of Suffolk*, 91 NY2d 198, 205 [1997]; *see also Valdez*, 18 NY3d at 82-83), nor had they promised to "provide assistance at some reasonable time" (*Sorichetti v City of New York*, 65 NY2d 461, 471 [1985]). In these circumstances, plaintiff could not have justifiably relied on any promises made or actions taken by defendants.

Contrary to the dissents' suggestion (*see* Rivera, J., dissenting op at 21-22; Wilson, J., dissenting op at 31, 33), and as this Court has previously explained, "[t]he mere existence of an order of protection, standing alone, will not prove justifiable reliance" (*Mastroianni*, 91 NY2d at 205; *see Valdez*, 18 NY3d at 72; *Sorichetti*, 65 NY2d at 470). A contrary rule would impermissibly expand government liability in violation of the policies supporting the special duty rule (*see Ferreira*, 38 NY3d at 316). Every day, New York courts issue hundreds of orders of protection in favor of persons at risk of harm. More than 195,000 orders of protection were issued in domestic violence cases in this State in 2021 alone (*see Governor Hochul Signs Legislative Package Strengthening Protections and Support for Survivors of Domestic Violence as Part of Domestic Violence Awareness Month* [Oct. 18, 2022], available at https://www.governor.ny.gov/news/governor-hochul-signs-legislative-package-strengthening-protections-and-support-survivors [last accessed November 14, 2022]). This grim statistic undermines the dissents' conclusion that the legislature intended to abrogate the *Cuffy* factors or markedly expand the potential for government tort liability by enacting the Family Protection and Domestic Violence

Intervention Act of 1994, and its mandatory arrest provisions (*see* Rivera, J., dissenting op at 23-24; Wilson, J., dissenting op at 17). Indeed, that statute's legislative history provides that it would cause no "fiscal implications" for local municipalities and only appropriated $500,000 "to implement . . . training requirements" and for an initial evaluation (Senate Introducer's Mem in Support, Bill Jacket, L 1994, ch 222 at 25). Given the numbers discussed above, the cost of potential municipal liability regarding violations of orders of protection would far exceed the amount appropriated and would have a significant impact on municipal finances.

That domestic violence has no place in our society, and that every effort must be made to eliminate it, is unquestionable. Special duty cases often come to us following instances of domestic violence and other "sympathetic circumstances" (*Kircher v City of Jamestown*, 74 NY2d 251, 257 [1989]) where emotions are charged and our shared "humanistic intuition" necessarily tempts us to disregard settled law in order to permit individual recovery (*Lauer v City of New York*, 95 NY2d 95, 103 [2000] [internal quotation marks omitted]). We have long warned, however, against adoption of the sort of "ad hoc exceptions to the special duty . . . rule" that the dissents propose (*McLean*, 12 NY3d at 204), and decline to "enlarg[e] the ambit of duty" here out of "concern for the consequential effects" of such a decision (*Lauer*, 95 NY2d at 105).

Plaintiff's argument concerning governmental function immunity is academic in light of our determination (*see Ferreira*, 38 NY3d at 310, 311-312).

WILSON, J. (dissenting):

Passersby found Dora Howell face down on the pavement outside her apartment building, screaming for help and unable to move. Ms. Howell's knee, pelvis, and hip were all broken, and her spine was fractured. She remained the hospital for over a month undergoing surgeries to treat her extensive injuries. How did this happen?

Unfortunately, such incidents are far too common. Ms. Howell's ex-boyfriend, Andre Gaskin, dragged her by the hair into his third-floor apartment, a floor above hers,

and physically assaulted her.  When Ms. Howell went to the window yelling for someone to call the police to help her, Mr. Gaskin said, "You want help?  I'll send you for help," and threw her out of the window.

Mr. Gaskin had violently assaulted Ms. Howell before, beginning when she was pregnant with their child. The first time he assaulted her, he threw her on the floor and kicked her stomach, causing her to bleed and require hospitalization.  On the basis of that assault, Ms. Howell obtained an order of protection against Mr. Gaskin, requiring him to stay away from and not communicate with her.  Based on Mr. Gaskin's subsequent conduct, Ms. Howell obtained seven additional orders of protection against him, the most recent of which issued less than two months before Mr. Gaskin threw her out of the window.  How did it happen that a woman who obtained eight orders of protection against the same abuser wound up unprotected?

Unfortunately, that question is harder to comprehend.  Orders of protection are supposed to mean something.  Ms. Howell called the police to report violations of the September 26th order on October 7, October 15, October 18, October 29, November 5, November 6, November 12, and November 13—each time explaining that Mr. Gaskin had violated the order of protection. Three times in the weeks leading up to this incident, the same two police officers, defendants Mosely-Lawrence and Meran, responded to her calls. As explained below, they assured Ms. Howell that they were handling the situation, yet completely failed to do so.  Their actions and inactions rendered Ms. Howell's multiple

orders of protection meaningless, constituting both a dereliction of their duties and an affront to the courts.

Seeking to confront the scourge of domestic violence and the historical reluctance of police officers to arrest abusers who violate orders of protection, our legislature in 1994 required officers to arrest persons in violation of domestic violence protective orders. The legislation removed all discretion from officers: even if a victim of domestic violence begs the officers not to arrest the violator, the police must arrest him. On numerous occasions, Mr. Gaskin was present at the scene when the police arrived and observed him in violation of the orders of protection. Each time they refused to arrest him in the face of a statutory requirement that they do so. How did that happen?

Unfortunately, I have no answer. But I do have an answer as to what should happen now: Ms. Howell should be able to pursue her claim for damages against the City, by establishing that the City bore her a "special duty" through any of three avenues: (1) the Domestic Violence Intervention Act (DVIA) establishes a statutory special duty, and its violation by the officers provides a basis for relief; (2) a triable issue of fact exists as to whether the officers assumed positive control of a dangerous situation; and (3) a triable issue of fact exists as to whether the officers' statements and conduct established representations on which Ms. Howell justifiably relied.

I

Ms. Howell and Mr. Gaskin lived in the same Brooklyn apartment building, in separate apartments one floor apart.[1] They had a romantic relationship for about a year, during which Mr. Gaskin was not violent until March of 2008, when Mr. Gaskin threw Ms. Howell, pregnant with their daughter, to the floor and kicked her stomach, requiring hospitalization and causing her to bleed several times during the course of her pregnancy. As a result of that assault, on April 12, 2008, she obtained the first of eight protective orders against Mr. Gaskin. The order required Mr. Gaskin to "[s]tay away from" Ms. Howell "and/or from" her home, school, business, and place of employment; "[r]efrain from communication or any other contact by mail, telephone, e-mail, voice-mail or other means" with Ms. Howell; and "[r]efrain from assault, stalking, harassment, menacing, reckless endangerment, disorderly conduct, intimidation, threats or any criminal offense or interference with" Ms. Howell. Ms. Howell obtained additional orders of protection against Mr. Gaskin on April 17, 2008; May 20, 2008; May 23, 2008; July 10, 2008; and July 14, 2008. On September 20, 2008, Ms. Howell reported to the police that Mr. Gaskin had violated an order of protection by kicking her front door and breaking its lock. On September 23, 2008, and September 26, 2008, Ms. Howell obtained her seventh and eighth protective orders against Mr. Gaskin. The September 26, 2008 order of protection expired on January 30, 2009, and thus was in effect during all of the relevant acts described below.

---

[1] On review of a motion granting summary judgment, we take the facts in the light most favorable to the party opposing it (here, Ms. Howell) (*see, e.g.*, *Jacobsen v New York City Health and Hospitals Corp.*, 22 NY3d 824, 833 [2014]). In addition, only Ms. Howell tendered evidence about the events in question, for reasons explained *infra* at 13-14.

In the week before Mr. Gaskin threw Ms. Howell out of the window, Ms. Howell called the police several times to report that Mr. Gaskin was violating the order of protection. Officers Mosely-Lawrence and Meran responded to Ms. Howell's calls. On the first occasion, Ms. Howell showed the officers her order of protection. The officers told Ms. Howell that they would "ensure . . . that [Mr. Gaskin] would be removed from the premises." The officers spoke to Mr. Gaskin, who told the officers that he would leave his apartment and stay at his uncle's house. Ms. Howell overheard one of the officers speaking by phone to the uncle; the officers told Ms. Howell that the uncle "was coming for him and they will be leaving the premises." The officers waited outside with Mr. Gaskin until his uncle arrived. From her window, Ms. Howell saw Mr. Gaskin drive off with his uncle.[2] One of the officers returned and told Ms. Howell that Mr. Gaskin would be remaining with family members and "won't be returning." The officers made Ms. Howell "feel assured he won't be coming back."

The next day, as Ms. Howell was about to enter her apartment, she heard Mr. Gaskin inside. Mr. Gaskin was speaking on the phone in Ms. Howell's apartment, arranging for someone to assault and rob her. Ms. Howell recorded him through the door, left the building, and called 911 from outside, explaining what she had overheard and recorded.

---

[2] According to Ms. Howell, Mr. Gaskin's uncle "is something . . . I don't know if he's a detective." Ms. Howell testified that the uncle came around "all the time," always dressed in a suit, was known to the responding officers, and that Mr. Gaskin was treated specially because the officers knew his uncle and treated him deferentially. The defendants have not disputed those facts.

The same two officers arrived. By that time, Mr. Gaskin had returned to his apartment on the third floor. The police asked Ms. Howell to show them the order of protection (which they had seen the day before) and Ms. Howell explained that Mr. Gaskin had ripped it up. Ms. Howell played the recording she had made; the officers told her that Mr. Gaskin had not mentioned her name as the person he was arranging to have robbed and assaulted, and therefore they were unconvinced. They found Mr. Gaskin in his apartment. Ms. Howell heard Mr. Gaskin tell the officers that he had returned for his clothes and the recording was not about Ms. Howell. The officers told Ms. Howell to return to her apartment and wait for them there, which she did. When the officers returned, one officer told Ms. Howell that they were "removing [Mr. Gaskin] from the premises" and he "would not be coming back." Ms. Howell saw the two officers escort Mr. Gaskin out of the building. The officers drove away, and Mr. Gaskin walked around the corner. The officers made Ms. Howell feel "assured that he won't be coming back."

The next day passed without incident until nighttime, when Mr. Gaskin began banging on Ms. Howell's door with a pipe. Ms. Howell called the police; the same two officers arrived and saw Mr. Gaskin, pipe in hand in Ms. Howell's apartment, with dents in the door and a lock broken off. The officers asked Mr. Gaskin, "What's going on now?" Mr. Gaskin responded, "I don't know, she called you." Ms. Howell told the officers to look at the dents in the door and the busted lock, and said, "Ya'll said he won't be coming back and he's banging on my door now. He popped one of the locks off from trying to bust his way in."

The officers did not arrest Mr. Gaskin.  They did not ask him put the pipe down.  They did not even ask him to explain himself.  Instead, they said to Ms. Howell, "Why don't you move?  Why don't you go and stay somewhere else if this keep[s] happening?"  When Ms. Howell said she had no place to go, and that she had a right to stay in her apartment and Mr. Gaskin was not permitted to come to the floor of her building, the officers asked her to show them the order of protection—the one those same officers had seen two days before.  Ms. Howell reminded them that Mr. Gaskin had ripped up her copy.  She asked them to look up the order (as they are required to do by statute and by NYPD protocol) but they told her it was "[her] business to go down and get another order of protection."

The officers told Mr. Gaskin to go upstairs and not come down to the second floor.  They went to talk with Mr. Gaskin, and then returned to Ms. Howell, telling her that Mr. Gaskin would not come downstairs; that Ms. Howell was "going to be okay;" that Mr. Gaskin "would be leaving;" and that Mr. Gaskin's uncle wasn't able to leave work until later, at which time he would remove Mr. Gaskin.  They concluded their visit by telling Ms. Howell that if she called them again, they would arrest her.

Mr. Gaskin did not leave.  He spent the night banging a hammer and stomping on the floor of his apartment, which was directly above Ms. Howell's.  Ms. Howell was scared: afraid to call the police because they threatened to arrest her if she called again, and afraid to leave her apartment because Mr. Gaskin was present: "I am scared not only of him but scared of getting arrested too."  She remained in her apartment overnight and into the next

day, leaving her house to attend the weekly meeting of her domestic violence victim support group in Brooklyn.

On November 18, 2008, while Ms. Howell was walking a friend home from their domestic violence class, Mr. Gaskin called her repeatedly, leaving messages asking where she was and apologizing for his behavior. Eventually she answered one of his calls and told him she was helping the friend.[3] Mr. Gaskin knew where this friend lived because he had previously followed the pair home from a prior class. He came to the friend's house and started yelling at Ms. Howell, who became embarrassed. Wanting to de-escalate the situation, Ms. Howell left with Mr. Gaskin. As Mr. Gaskin dragged her by the arm down the street towards her building, she tried to keep him calm. When they arrived, they talked outside the building for about an hour. He wanted to talk inside. Ms. Howell eventually capitulated because she thought he seemed much calmer and said he just wanted to talk about their daughter.

---

[3] Those of us who have not experienced domestic violence might wonder why Ms. Howell picked up the phone. In Ms. Howell's case, not answering the phone would not prevent Mr. Gaskin from finding her eventually given that he knew where she lived and in fact lived in the same building. Even putting that aside, researchers have long studied the question of why victims of domestic violence return to their abusers. People who have been repeatedly exposed to uncontrollable and aversive events often develop a trait described as "learned helplessness" (*see Neta Bergai et al.*, *Posttraumatic Stress Disorder and Depression in Battered Women: The Mediating Role of Learned Helplessness*, 22 J Fam Viol 5, 267 [2007]). Learned helplessness is a common and predictable response to domestic violence, and involves a "substantial decrease in associating action with positive outcome and leads to a marked reduction in the range of responses to external demands" (*id.* at 268).

However, once they were inside the building, Mr. Gaskin blocked the door to prevent her from leaving and took her phone. He pulled her by the hair and neck up to his apartment on the third floor while she tried to fight him off. Inside his apartment, he hit and choked her. She tried to yell for help from the window. Mr. Gaskin hit her in the head, and Ms. Howell fell to the floor. Mr. Gaskin then picked her up by her hair, told her, "You want help, I'll send you for help," and threw her out of the window.

Ms. Howell landed on the handicap ramp leading into her building. Eventually, she caught the attention of two passersby, who called for an ambulance. One woman placed her coat under Ms. Howell's head and told her not to move. The same two officers arrived. They told Ms. Howell that she "should have listened" to them. They did not go inside when Ms. Howell told them Mr. Gaskin was upstairs and had pushed her out of the window. When the EMTs arrived, the same two officers told them that Ms. Howell was "fine," that nothing was wrong with her.

II

Ms. Howell sued the City and the two officers, alleging negligence. On February 12, 2011, Supreme Court ordered that the two officers be deposed on June 7, 2011. The City failed to produce the officers for depositions. On August 2, 2011, Supreme Court ordered the City to produce the officers for deposition on December 13, 2011. Once again, the City failed to produce the officers as ordered by the court. On June 19, 2012, Supreme

Court again ordered the city to produce the officers for deposition, this time on October 30, 2012. Once again, the City failed to comply with the court's order.

Instead, defendants moved to dismiss the complaint pursuant to CPLR 3211 (a) (7) and/or for summary judgment, on the following grounds: (1) Ms. Howell's complaint against the City failed to plead a special duty; (2) "the City has put forth sufficient evidence to establish that no special duty—of any of the types recognized by the Court of Appeals [a statute, assumption of direction and control, or voluntary assumption of a special duty]— existed as a matter of law"; and (3) Ms. Howell's claim against the City for negligent hiring, training or supervision against the City must be dismissed because (a) if the officers are liable for damages under a negligence theory, the City will be held responsible under *respondent superior*, and therefore cannot be held liable for negligent supervision, retention, training or hiring; or (b) if the officers are not liable for damages, "there is no basis for imposing liability on the City . . . regardless of the quality of its training or supervision."[4]  Ms. Howell opposed defendants' summary judgment motion on the ground that the motion was premature because defendants had failed to produce the officers for depositions, despite numerous court orders compelling those depositions.  Supreme Court

---

[4] Although the motion to dismiss and for summary judgment was filed on behalf of all defendants, the arguments pertain to the City's liability only, and do not make any argument as to why the complaint against the officers should be dismissed.  In particular, the motion does not claim that the officers (or City) are entitled to any sort of immunity, so it is curious that the majority chooses to avoid "*[p]laintiff's* argument concerning governmental function immunity" (majority mem at 5 [emphasis added]), when the defendants did not assert any such argument in their motion below and the burden to assert and, ultimately, prove such immunity would rest on defendants, not Ms. Howell.

denied defendants' motion, without opinion, "with leave to renew after completion of discovery."

The Appellate Division, among other things, granted defendants' motion for summary judgment, without addressing the incompleteness of discovery or the City's failure to comply with Supreme Court's orders requiring the depositions of the officers. Instead, the Appellate Division held that Ms. Howell had failed to demonstrate that the defendants owed her a special duty. As a general rule, a municipality may not be held liable for injuries resulting from a simple failure to provide police protection (*see Cuffy v City of New York*, 69 NY2d 255, 260 [1987]). The underlying rationale is that "while a municipality owes a general duty to the public at large to furnish police protection, this does not create a duty of care running to a specific individual sufficient to support a negligence claim" (*Valdez v City of New York*, 18 NY3d 69, 75 [2011]). However, an exception to the general rule exists where a plaintiff can show that the municipality owed her a special duty. Such a special duty can arise in three ways, each of which is relevant here.

First, a special duty can arise where the plaintiff belongs to a class for whose benefit a statute was enacted. We have held that "[t]o form a special relationship through breach of a statutory duty the governing statute must authorize a private right of action" (*McLean v City of New York*, 12 NY3d 194, 200 [2009]). A private right of action, in turn, "may fairly be implied when (1) plaintiff is one of the class for whose particular benefit the statute was enacted; (2) recognition of a private right of action would promote the legislative

purpose of the governing statute; and (3) to do so would be consistent with the legislative scheme" (*id.*).

Second and third, even where no statute creates a special duty, the actions of a governmental defendant may establish a special duty with regard to a particular person, under either of the two theories articulated by the City in its motion to dismiss: (1) assumption of positive direction and control of a dangerous situation (*see Smullen v City of New York*, 28 NY2d 66 [1971]; *Ferreira v City of Binghamton*, 38 NY3d 298 [2022]); or (2) the governmental defendant's voluntary assumption of a duty to the plaintiff beyond what is owed to the public generally (*see Applewhite v Accuhealth, Inc.*, 21 NY3d 420 [2013]). A municipality voluntarily assumes a special duty (which we have sometimes termed a "special relationship") with a party where there is:

> "(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking" (*Tara N.P. v Western Suffolk Bd. of Coop. Educ. Servs.*, 28 NY3d 709, 714-715 [2017]).

The Appellate Division held that the defendants were entitled to summary judgment as a matter of law because Ms. Howell had not raised an issue of fact as to any type of special duty in response to defendants' motion for summary judgment. The majority agrees, holding that Ms. Howell did not preserve a statutorily-based argument as to the

existence of a special duty, and that the factual record establishes that Ms. Howell cannot establish a special duty otherwise. I disagree as to both.

## III

I begin with a preliminary matter related to fundamental fairness of our processes. Supreme Court thrice ordered the City to produce the defendant officers for their depositions. The City deposed Ms. Howell, and the Appellate Division and majority used her testimony against her to extinguish her claim. Supreme Court, which should be offered wide latitude in managing discovery,[5] concluded that it would be inappropriate even to consider the City's motion to dismiss or for summary judgment until the two defendant officers could be deposed. Suppose, for example, the officers explained that Mr. Gaskin's uncle was a high-ranking NYPD official, who instructed them that he would ensure that his nephew would comply with the orders of protection and that such information should be conveyed to Ms. Howell. Or suppose the officers merely said, as Ms. Howell argues here, that Mr. Gaskin was being provoked by Ms. Howell's reports to the police, and as long as she did not call them in the future, they had the situation under control and she could rely on that representation. Or suppose the officers said that they knew they had a

---

[5] *See, e.g.*, *Hamed v Alas Realty Corp.*, — AD3d —, —, 2022 NY Slip Op 05518, *2 (2d Dept 2022) ("The supervision of discovery, and the setting of reasonable terms and conditions for disclosure, are within the sound discretion of the Supreme Court. The Supreme Court's discretion is broad because it is familiar with the action before it, and its exercise should not be disturbed on appeal unless it was improvidently exercised" [internal quotation marks omitted]) quoting *Provident Life & Cas. Ins. Co. v Brittenham*, 284 AD2d 518, 518 (2d Dept 2001); *Di Mascio v General Elec. Co.*, 307 AD2d 600, 601 (2d Dept 2003) ("The trial court is afforded broad discretion in supervising disclosure and its determinations will not be disturbed unless that discretion has been clearly abused").

mandatory statutory duty to arrest Mr. Gaskin, but decided to break the law. Would Ms. Howell still have no claim?

Given Supreme Court's repeated orders, flouted by the City, to produce the two officers for deposition, it is perfectly understandable that Ms. Howell's counsel would object to the City's motion on the ground that discovery was not complete, and perfectly understandable that Supreme Court, in view of the repeated defiance of its orders and the centrality of these two officers to the claims asserted, would summarily deny the motion without prejudice to its renewal once discovery was complete. Where our preservation doctrine rests on avoiding the "blindsiding" of parties, the party blindsided here is Ms. Howell. I would hold that the Appellate Division abused its discretion in granting the City summary judgment in view of the City's repeated flouting of Supreme Court's orders and the centrality of Officers Mosely-Lawrence and Meran to the issues in this case.

IV

Putting aside the procedural unfairness of treating any claim of Ms. Howell's as unpreserved, both issues are fully preserved for our decision. The majority agrees that Ms. Howell's claims concerning the existence of a nonstatutory special duty are preserved; it disposes of those claims on the merits. I discuss them *infra* at part VI. Whether the DVIA imposes a statutory special duty is also preserved for our review, albeit by the City rather than Ms. Howell.

Our preservation doctrine generally requires that we will not consider an issue on appeal that has not been raised below, out of concerns for blindsiding parties and judicial

economy. The paradigmatic cases include the failure to object to the introduction of evidence, failure to object to jury instructions, or failure to object to the qualifications of jurors. In such cases, judicial efficiency and orderly judicial process require the timely interposition of objections; the court system could not function were litigants free to raise those sorts of objections *post hoc*, when a trial court could have addressed them had they been timely made.

As to other sorts of issues, not those where the question is the failure to interpose a timely objection, but instead the failure to raise a legal issue in the court of instance, we have also declined to hear new issues, raised for the first time on appeal, out of a concern for the blindsiding of an adverse party (*see, e.g.*, *Misicki v Caradonna*, 12 NY3d 511, 519 [2009] ["We are not in the business of blindsiding litigants, who expect us to decide their appeals on rationales advanced by the parties, not arguments their adversaries never made"]). The preservation doctrine, however, is "far less restrictive than some case language would indicate"; we have carved out an exception that applies even when issues were "raised neither at the trial nor at previous states of appeal," so long as the new contentions could not have "been obviated of cured by factual showings or legal countersteps" (*Telaro v Telaro*, 25 NY2d 433, 439 [1969]; *see also American Sugar Ref. Co. of N.Y. v Waterfront Commn. of N.Y. Harbor*, 55 NY2d 11, 25 [1982]; Arthur Karger, Powers of the New York Court of Appeals § 17:2 [3d ed rev 2005]).[6] Here, however,

---

[6] The circumstances here fit within the exception as well. The question of whether a statute (here, the DVIA) creates an implied cause of action is a pure question of law; there are no "factual showings or legal countersteps" that could have resolved it below, "turning as it

neither judicial efficiency nor a concern for blindsiding applies. The City itself, in its moving papers, raised the issue of whether a statute created a special duty, and spent several pages arguing that no such duty existed. Because the issue was clearly raised in Supreme Court, it was preserved. The City cannot claim to have been blindsided because it raised the issue as a ground on which it sought to dismiss the complaint. Although it is true that Ms. Howell opposed the City's motion solely on the ground that the City had failed to provide the court-ordered discovery to which she was entitled, Ms. Howell's failure to address the issue in Supreme Court does not render it unpreserved. One might contend that Ms. Howell waived the issue by failing to respond to it, but waiver is different from a lack of preservation: waiver requires a deliberate decision to forego a claim or argument (*see People v Ahmed*, 66 NY2d 307, 311 [1985]). Neither the City nor the Appellate Division contended that Ms. Howell had waived the argument, and because Ms. Howell prevailed in Supreme Court, it would be difficult to conclude that she affirmatively waived a statutorily-based claim of special duty rather than standing on what she believed (and Supreme Court held) was the clear winner, deferring the merits argument until the completion of discovery.

---

does on legislative intent" (*American Sugar Ref. Co.*, 55 NY2d at 25). The issue presented to us is whether, when officers disobey the legislature's mandatory arrest command and a victim of domestic violence is injured as a result, that victim can sue the municipality to recover damages. Our Court may answer yes or no, but *some* answer will, at least, provide the legislature, the Governor, and the public with the basis to act accordingly should they disagree with us. This is precisely why our *Telaro* exception exists: no fact in this or any future case will affect our determination as to statutory special duty arising from the DVIA's mandatory arrest provision.

Here, we have (1) the presentation of the statutorily-based special duty issue in Supreme Court, and (2) the decision of the Appellate Division that "plaintiff's alternate contention that the defendants violated a statutory duty to her is without merit" – with no suggestion by the Appellate Division that the issue was not preserved (*see* AD3d 771, 774 [2d Dept 2021]). None of our decisions on preservation holds that when a party has raised a question of law in the court of instance, that court decides on a different ground, and the Appellate Division reverses by reaching the issue raised below, the issue of law is unpreserved for our review. No purpose underlying our preservation rules is served by treating the question decided here by the Appellate Division—that the DVIA's requirement that police officers arrest violators of protective orders who are found at the scene in violation of such an order does not create a statutory duty—as unpreserved. The City itself advanced that issue as a ground for ruling its favor, which the Appellate Division then did.

V

I would hold that CPL 140.10 (4) (b) establishes a statutory special duty for holders of domestic violence protective orders. In *Pelaez v Seide* (2 NY3d 186, 200 [2004]), we held:

> "To form a special relationship through breach of a statutory duty, the governing statute must authorize a private right of action. One may be fairly implied when (1) the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) recognition of a private right of action would promote the legislative purpose of the governing statute; and (3) to do so would be consistent with the legislative scheme."

The first prong is indisputably met here.  CPL 140.10 (4) (b) requires:

> "Notwithstanding any other provisions of this section, a police officer shall arrest a person, and shall not attempt to reconcile the parties or mediate, where such officer has reasonable cause to believe that: . . .
>
> "(b) a duly served order of protection or special order of conditions issued pursuant to subparagraph (i) or (ii) of paragraph (o) of subdivision one of section 330.20 of this chapter is in effect, or an order of which the respondent or defendant has actual knowledge because he or she was present in court when such order was issued[;] . . . and
>
>> "(i) Such order directs that the respondent or defendant stay away from persons on whose behalf the order of protection or special order of conditions has been issued and the respondent or defendant committed an act or acts in violation of such 'stay away' provision of such order; or
>>
>> "(ii) The respondent or defendant commits a family offense as defined in subdivision one of section eight hundred twelve of the family court act or subdivision one of section 530.11 of this chapter in violation of such order of protection or special order of conditions."

Ms. Howell, who had eight domestic violence orders of protection against Mr. Gaskin ordering him to stay away, is a member of the class for whose benefit CPL 140.10 (4) was enacted: victims of domestic violence who have obtained orders of protection.

I turn next to the third *Peleaz* factor, which we have deemed the "most important" of the three and "frequently determinative" (*Ortiz v Ciox Health LLC*, 37 NY3d 353, 360, 361 [2021]).  "[W]here a statutory scheme contains private or public enforcement mechanisms, this demonstrates that the legislature considered and decided what avenues of relief were appropriate" (*id.* at 362).  Here, the legislature imposed a duty but provided no public or private enforcement mechanism, and no preexisting mechanism existed by

which the new statutory duty could be enforced.  Thus, the most important *Peleaz* factor cuts in favor of implying a private right of action.  Turning to the second factor, advancement of the legislative scheme, we have noted that "[t]he second prong is itself a two-part inquiry. We must first discern what the Legislature was seeking to accomplish when it enacted the statute, and then determine whether a private right of action would promote that objective" (*id.* at 363).  The legislature's objective in enacting CPL 140.10 (4) as part of the DVIA is painfully obvious.

In 1994, the year the DVIA was enacted, the New York State Division of Criminal Justice Services recorded 60,467 reports of domestic violence between married couples. Of these offenses, 55,683 were perpetrated by husbands against their wives (or common law wives); 5,691 of the incidents included a husband violating his wife's order of protection against him.[7] Data at the time covered only married couples; thus the numbers are vastly understated. Despite the underinclusive nature of the data, DCJS recorded 87 domestic violence homicides among this subset in 1993 alone.[8] During the years 1991 through 1995 in New York state, DCJS data showed that the rate of violent crimes in general decreased every year. During the same period, however, domestic violence offenses did not decrease. Legislators who sponsored the DVIA estimated that "some 4,000 women will be killed nationally this year by way of incidents of domestic violence. Some

---

[7] Division of Criminal Justice Services,1994 Crime and Justice Annual Report, at 38.
[8] Commission on Domestic Violence Fatalities, Report to the Governor (October 1997), at 5.

15 seconds can't elapse in this country without a woman being a victim of domestic violence."[9]

By enacting the DVIA, the legislature sought to protect victims of domestic abuse from the escalation of violence—and the police indifference—of exactly the type that Ms. Howell experienced. In 1993 and 1994, legislators held months of hearings across the state to gather information about the scope and causes of, and potential solutions to, domestic violence. Those hearings included testimony from, *inter alia*, survivors, law enforcement, judges, advocates, academics, and social services professionals. Both the Senate and Assembly sponsors' bill memoranda termed domestic violence "a crime of enormous magnitude and tragic consequences," and observed that "[t]he National Institute of Mental Health has identified battering as the leading cause of injury to women, more than auto accidents, rapes and muggings combined" (Assembly Sponsor's Letter in Support, Bill Jacket, L 1994, ch 222 at 10-11; Senate Sponsor's Mem in Support, Bill Jacket, L 1994, ch 222 at 23).

The sponsors of the DVIA were aware that police often failed to enforce orders of protection or otherwise failed to intervene in domestic violence situations. Our court had long been aware of the problem as well. In *Bruno v Codd* (47 NY2d 582 [1979]), 12 domestic violence victims sued the NYPD, the Department of Probation, and the Family Court, alleging discrimination and misconduct against them for the defendants' failure to

---

[9] Public Hearing on the Revision of New York State's Laws Pertaining to Domestic Violence, including how the Statutory Law Can Better Protect Victims of Domestic Violence and Prosecute Violent Family Offenders (11/29/1993), at 3.

enforce and comply with statutes and regulations regarding domestic violence complaints. We noted that a "primary concern voiced in plaintiffs' complaint is frequent failure of officers of the New York City Police Department to respond to requests for safeguarding made by or on behalf of a battered or threatened wife, presumably because of the reluctance on the part of the police to intervene in what they reflexively characterized as 'domestic disputes' rather than criminal offenses" (*id.* at 590).

In the introduction to the Senate bill that became the DVIA, the sponsors (composed of 37 Senators) noted that "one of the major problems contributing to the recurrence of domestic violence lies in the absence of aggressive enforcement by law enforcement officials." Because of this, a key provision of the legislation provides that a police officer must arrest someone who violates a stay-away order of protection (CPL 140.10 [4]). Senator Saland's letter to the Governor's Counsel listed "New York's first mandatory arrest law" first among the DVIA's highlights (Senate Sponsor's Letter in Support, Bill Jacket, L 1994, ch 222 at 6). Assemblyperson Weinstein's letter to the Governor's counsel likewise identified the mandatory arrest provision as a "cornerstone of this legislation" (Assembly Sponsor's Letter in Support, Bill Jacket, L 1994, ch 222 at 9) The Governor's approval memorandum noted that the DVIA included "a four-year pilot program requiring mandatory arrest of family offenders,"[10] and further explained that the DVIA created a

---

[10] The mandatory arrest provision has been renewed every two years without lapse since its enactment in 1994. In addition, the New York Police Department patrol guide in effect when officers Meran and Mosely-Lawrence responded to Ms. Howell's calls for help required that officers must "[a]rrest offender even if complainant-victim requests that offender not be arrested" (NYPD Patrol Guide 208-36 [issued Aug. 15, 2003]). It also required officers, when a complainant was not able to produce the order of protection, to

system by which police officers could "retrieve information on orders of protection and family court arrest warrants automatically," which would "enhance police response in domestic violence cases" (Governor's Approval Mem, Bill Jacket, L 1994, ch 222 at 26-27).

The legislative history contains letters of support from hundreds of activists, service providers, and ordinary citizens urging the Governor to approve the bill. Those letters overwhelmingly focus on the concern addressed by the mandatory arrest provision (for example, that "[b]atterers ignore Orders of Protection and go unpunished" and that "[t]he courts, the police and the legislature have historically failed to protect battered women and their children"), and many explicitly voice their support for that provision (*see e.g.* Letters in Support, Bill Jacket, L 1994, ch 222, *passim*). Hundreds of supporters called the Governor's office; internal communications indicate that the callers "specifically want[ed] the mandatory arrest part of the bill left intact" (Bill Jacket, L 1994, ch 222, at 50-51). Ironically, the defendant here, the City of New York, wrote to the Governor to pronounce: "One of the most critical provisions of this bill would call for arrests in cases involving family offenses" (City of New York Office of the Mayor, Mem in Support, Bill Jacket, L 1994, ch 222 at 80).

Thus, it could not be clearer that the legislature believed it extraordinarily important that perpetrators of domestic violence who violated orders of protection would be arrested

---

call first the Central Records Division, then the precinct of occurrence, then the Communications dispatcher to verify the details of the order (*see id.*).

– without exception.  That satisfies the first part of *Peleaz*'s second prong.  The second part of that prong asks whether a private right of action would promote that objective.

The salutary effect of damage suits for officers who violate the rights of others is well established (*see e.g.*, *Richardson v McKnight*, 521 US 399, 399 [noting the purpose of damage awards under 42 USCA § 1983, enacted as part of the 1871 Civil Rights Act, is to "deter[] state actors from depriving individuals of their federally protected rights"). The countervailing concern—the drain on financial resources of the governmental defendants who end up paying for the officers' transgressions—is carefully cabined by two features. First, governmental immunity doctrines bar recovery in most cases; the most egregious cases, where immunity is unavailable, have not resulted in governmental insolvency (*see, e.g.*, *Brownridge v City of New York*, No. 1:2021cv04603 [EDNY 2021] [$13,000,000 settlement for misconduct including faulty detective work]; *Alvarado v City of New York*, index No. 516399/2019 [Sup Ct, Kings County] [$12,000,000 settlement for excessive force resulting in injury to neck and spinal cord]; *see generally* Legal Aid Society, *Law Enforcement Lookup, Civil Lawsuits (NYPD)*, https://legalaidnyc.org/law-enforcement-look-up/ [last accessed Nov. 2, 2022]).  Second, the prospect of money damages gives governmental authorities the incentive to cause their employees to comply with the law. The deterrent function of compensatory damages to incentivize governmental actors to comply with law is firmly established (*see e.g.* *Hardin v Straub*, 490 US 536, 539 [1989] ["(42 USC) § 1983's chief goals (are) compensation and deterrence"]; *Memphis Community School Dist. v Stachura*, 477 US 299, 307 [1986] ["Deterrence is also an important purpose of this system (28 USC § 1983),

but it operates through the mechanism of damages that are *compensatory*"]; *Carey v Piphus*, 435 US 247, 256-257 [1978] [compensatory damages have an "inherent" and "formidable" deterrent effect]). For these reasons, I would hold that the second part of *Peleaz*'s second prong has been met as well.

In short, the City bore a statutory special duty to Ms. Howell, because the satisfaction of the test for a private right of action establishes that special duty, as required by *Peleaz*. The officers plainly breached that duty; causation and damages would be determined at trial.[11]

---

[11] Only for the purpose of this appeal do I assume that *Peleaz* properly equated the test for the existence of a statutory special duty with a private right of action.
Conceptually, determining whether to imply a cause of action asks whether the *legislature* wished to provide one. The presumption under our caselaw is that the legislature did *not* intend to create a cause of action, which can be overcome when the three-part test establishes that the legislature must have meant to allow one. But negligence claims (and subsidiary doctrines such as special duty) are established by the common law and courts. The legislative presumption operates in exactly the opposite direction: the legislature can displace the common law only by doing so clearly and unequivocally *(see, e.g.*, *Hechter v New York Life Ins. Co.*, 46 NY2d 34, 39 ["(I)t is a general rule of statutory construction that a clear and specific legislative intent is required to override the common law"]). Because common law doctrines like negligence are judicially managed, the courts are expected to adapt them in response to changing needs (*see, e.g.*, *Macpherson v Buick Motor Co.*, 217 NY 382, 391 [1916] [noting theories of negligence ought to change alongside the "the needs of life in a developing civilization"]; *Woods v Lancet*, 303 NY 349, 355 [1951] ["We act in the finest common-law tradition when we adapt and alter decisional law to produce common-sense justice"]). Thus, determining the scope of the common law negligence claim and the judicially-made special duty requirement is a judicial function shaped by the court's evaluation of public policy. Our evaluation should certainly consider the legislature's policy in enacting the DVIA and the mandatory arrest requirement, but is not controlled by the absence of an explicit or implied right of action. If, on the other hand, we were evaluating a statutory cause of action, we would not apply these immunities (or, for that matter, ask whether the injury was proximately caused by the officers' conduct); but-for causation is all that a plaintiff must show when a statute sets out prohibited conduct and provides a civil remedy.

Analytically, *Peleaz* misapplied *Sheehy v Big Flats Community Day* (73 NY2d 629 [1989]). A subsequent case, *McLean v City of NY* (12 NY3d at 200), entrenched the error. In *Sheehy*, a minor was served alcohol at a community fair and was injured. She sued to recover for her injuries. We separately considered and rejected, first, her claim that the various statutory prohibitions against serving alcohol to minors created a private right of action, and second, her claim that an action in negligence should lie. We rejected the latter not because there was no private right of action in the various statutes, but for two reasons: (1) courts had consistently held that no "duty exists to protect a consumer of alcohol from the results of his or her own voluntary conduct"; and (2) the Dram Act "made express provision for civil remedy, albeit a narrower remedy than the plaintiff might wish," which we saw as a factor counseling against recognizing a duty (*Sheehy*, 73 NY2d at 636). *Sheehy*, then, supports my view. *Peleaz* and *McLean* conflate *Sheehy*'s two distinct holdings. If, for example, *Sheehy* had held that a duty existed, the fact that the legislature had provided a different civil statutory remedy would not be sufficient to displace the common law allowing tort recovery. *Peleaz* and *McLean*, by using the legislature's silence on the provision of a civil remedy to eliminate a common-law tort action that might otherwise exist, contravene our requirement that a legislative displacement of the common law must be clear and unmistakable.

That error is further evidenced by the doctrine of negligence per se. As recognized in the First, Second, and Third Restatements of Torts, the violation of a statute intended to protect the victim may establish both duty and breach (*see, e.g.*, *Martin v Herzog*, 228 NY 164 [1920]; *see also* Restatement [Third] of Torts: Liability for Physical and Emotional Harm § 14, Comment *c*, Statutory Violations as Negligence Per Se ["(N)egligence per se has been settled doctrine in American tort law for many decades"]). Under that settled doctrine, "[a]n actor is negligent if, without excuse, the actor violates a statute that is designed to protect against the type of accident the actor's conduct causes, and if the accident victim is within the class of persons the statute is designed to protect" (*id.* § 14).

Far from requiring an implied cause of action to create a statutory duty, traditional negligence per se doctrine

> "presupposes a statute that declares conduct unlawful but that is silent as to civil liability and that cannot be readily interpreted as impliedly creating a private right of action. This Section [of the Restatement] hence acknowledges that the statute may not itself provide civil liability. This Section nevertheless concludes that courts, exercising their common-law authority to develop tort doctrine, not only should regard the actor's statutory violation as evidence admissible against the actor, but should treat that violation as actually determining

VI.

Independently from the existence of a statutory special duty, Ms. Howell has raised a triable issue of fact as to the existence of a special duty based on the City's assumption of control over a dangerous situation or its voluntary assumption of a duty to Ms. Howell. As to both of these theories, the majority rests its decision solely on its assertion that the record conclusively demonstrates that Ms. Howell did not justifiably rely on anything the officers did or said.

A

---

the actor's negligence. An unexcused violation of the statute is thus negligence per se" (*id.* § 14, Comment *c*).

Negligence per se thus

"addresses the interstices left when statutes neither provide for nor negate private rights of action. When the legislature has not provided a remedy, but the interest protected is physical or emotional harm, courts may consider the legislative purpose and the values reflected in the statute to decide that the purpose and values justify adopting a duty that the common law had not previously recognized." (*id.* § 38, Comment *c*).

Thus, were we to evaluate Ms. Howell's claim under the traditional doctrine of negligence per se, we would regard the officers' unexcused statutory violation as "actually determining [their] negligence" (*id.* § 14, Comment *c*). Proximate cause, of course, would be a question for the finder of fact.

In Supreme Court, the City contended that a "special duty can be created . . . when the municipality assumes positive direction and control in the face of a known, blatant and dangerous safety violation." The City argued that such instances were "rare" because our caselaw required that "the defendant knowingly directed the plaintiff into the path of danger" (citing *O'Connor v City of New York*, 58 NY2d 184 [1983]) and applied only "where the municipality exercises direct personal supervision over the injured person." However, earlier this year we decided *Ferreira v City of Binghamton* (38 NY3d 298 [2022]), which renders the City's argument below untenable. In *Ferreira*, we held that a special duty exists when governmental actors plan and enforce a no-knock warrant, with the duty running to all occupants of the target premises (*see id.* at 317-318). The police in *Ferreira* did not knowingly direct any specific person into the path of danger (they did not even know the plaintiff existed) and the plaintiff was not someone over whom the police exercised any supervision or with whom the police had any relationship whatsoever. Instead, *Ferreira* held that a special duty exists as to the planning and execution of no-knock warrants because "the police direct and control a known and dangerous condition, effectively taking command of the premises and temporarily detaining occupants of the targeted location" (*id.* at 318). Key to that holding was the determination that "the municipality's duty to the individuals in the targeted premises, a limited class of potential plaintiffs, exceeds the duty the municipality owes to the members of the general public," thus distinguishing the claim from those asserting negligence to the public at large (*id.*). *Ferreira*'s articulation contains two important innovations in the common law of special duty: first, when the government takes charge of a dangerous situation, the governmental

defendant need not know of the existence of a person for the special duty to attach to that person; and second, we created a categorical rule applicable to all no-knock warrants, which we had not previously done for any type of special duty.

Here, Ms. Howell has raised a triable issue as to whether the police "direct[ed] and controll[ed] a known and dangerous condition" (*id.*).  The existence of multiple orders of protection; Mr. Gaskin's prior beating of a pregnant Ms. Howell; and his repeated violations of the orders of protection observed by the officers, including his bashing of her door with a pipe and breaking her lock, establish that the situation was known and dangerous.  In the light most favorable to Ms. Howell, the officers' repeated assurances that she would be safe; the officers' involvement of Mr. Gaskin's uncle; the emphatic instruction that Ms. Howell should not call the police again; and the officers' decision to violate CPL 140.10 (4) and instead resolve the threat in their own way, would allow a trier of fact to conclude that the officers had "directed and controlled" the dangerous condition.

B

In Supreme Court, the City also contended that a special duty could be created "when the municipality voluntarily assumes a duty that generates justifiable reliance by the person who benefits from the duty" (citing *Peleaz*, *Cuffy*, and *Valdez*).  The majority, after reciting the four *Cuffy* factors necessary to establish the voluntary assumption of a special duty, does not contend that Ms. Howell has failed to meet the first three factors, but holds that she failed to raise a triable issue of fact as to the "critical" fourth element—justifiable reliance.

Here, the fourth factor is "critical" because Ms. Howell has indisputably satisfied the other three. The first two factors in the special relationship test—assumption of an affirmative duty to act and knowledge that inaction could lead to harm—are satisfied as a matter of law by the issuance of an order of protection (*Mastroianni v County of Suffolk*, 91 NY2d 198, 204 [1997] ["(A) duly issued order of protection constitutes an 'assumption' of an 'affirmative duty' of protection coupled with awareness that 'inaction could lead to harm'"], quoting *Cuffy*, 69 NY2d at 260). No one contends that the officers' repeated interactions with Ms. Howell fail to satisfy the third "direct contact" *Cuffy* factor. Thus, Ms. Howell's claim that the City owed her a special duty via *Cuffy*'s voluntary assumption test turns solely on the issue of justifiable reliance.

On summary judgment, all facts must be taken in the light most favorable to Ms. Howell. Here, defendants proffered no evidence at all. A reasonable trier of fact could have concluded that the officers repeatedly told Ms. Howell she would be safe; that they had talked to Mr. Gaskin and told him not to harass her; that they assured her Mr. Gaskin would be staying with his uncle; and that the police were familiar with his uncle, who has some special relationship with the police. The City and Appellate Division focus on other portions of Ms. Howell's testimony—for example, that she was scared, or that she knew Mr. Gaskin had remained in his apartment despite the officers' instruction that he leave, or that the police told her to move out of her own apartment and threatened her with arrest if she called them again—all of which, if taken in the light *least* favorable to Ms. Howell, could result in a verdict against her. Notably, though, "credibility, the reconciliation of . . .

conflicting statements, a determination of which should be accepted and which rejected, and the truthfulness and accuracy of [a witness's] testimony, whether contradicted or not, were exclusively for the jury, the trier of the facts. . . The court could not put its finger upon any particular item of testimony by [a witness] and say, as matter of law, that it was the truth" (*Lee v City Brewing Corp.*, 279 NY 380, 384 [1939] [citations omitted]).

Evaluating the facts in the light most favorable to Ms. Howell, she understood Mr. Gaskin had not left the building because his uncle was working late and not immediately available to transport him away and that Mr. Gaskin's prior appearances were merely to recover his clothes and were sanctioned by the officers. From her observations about the relationship between Mr. Gaskin's uncle and the officers, a trier of fact could conclude that Ms. Howell understood that the officers were taking a step to ensure her security by involving the uncle, who appeared to have some authority over the officers. A reasonable trier of fact could also have found that by telling Ms. Howell that if she called the police again, *she* would be arrested, the police were telling her they had the situation under control, there was absolutely no need for her to call again to seek their further protection, and it was her summoning of the police that was escalating the situation with Mr. Gaskin. Furthermore, despite her experiences with the officers thus far, when Ms. Howell was being assaulted on November 18, she yelled out of the window to ask any person within earshot to call the police, demonstrating that she continued to rely on them to aid her. "[W]hether a special relationship exists is generally a question for the jury" (*Coleson v City*

*of New York*, 24 NY3d 476, 479 [2014]). The evidence tendered in this case creates a triable issue of fact, sufficient to defeat a motion for summary judgment.

Most fundamentally, victims of domestic violence who have obtained orders of protection from our courts are a limited class of persons justifiably entitled to rely on the DVIA's mandatory arrest provision. How could it be otherwise? The majority's holding—that despite the multiple orders of protection and emphatic action by the legislature and Governor requiring the arrest of violators of such orders, two officers are able to countermand all three branches of government and render the victim's reliance on the law "unjustifiable" —is baffling. What, then, becomes of our holding in *Mastroianni* that "a duly issued order of protection constitutes an 'assumption' of an 'affirmative duty' of protection coupled with awareness that 'inaction could lead to harm'" (91 NY2d at 204)? In *Mastroianni*, we held that a plaintiff could justifiably rely on police protection even though the police told her they would *not* arrest her assailant. The order itself, and the protection it is intended to afford, are the affirmative undertakings on which a plaintiff may justifiably rely (*see Dinardo v City of New York*, 13 NY3d 872, 877 [2009, Lippman, J., concurring] ["The touchstone of the special duty rule is that the government, by its undertaking to the specific plaintiff, has gone above and beyond the general duty it owes to the public and created a unique relationship with that plaintiff, upon which he or she is entitled to rely" (citation omitted)]).

Likewise, in *Sorichetti v City of New York* (65 NY2d 461 [1985]), we held that a special relationship existed, and emphasized that an order of protection

> "evinces a preincident legislative and judicial determination that its holder should be accorded a reasonable degree of protection from a particular individual. It is presumptive evidence that the individual whose conduct is proscribed has already been found by a court to be a dangerous or violent person and that violations of the order's terms should be treated seriously. Significantly, the class of potential victims to whom a duty to investigate might arise is necessarily limited by the terms of the order" (*id.* at 469-470; *see also Cuffy*, 69 NY2d at 262 ["(T)he presence of a judicial order of protection contributed to our conclusion in *Sorichetti* that an actionable relationship existed"]).

Parallels between *Sorichetti* and Ms. Howell's case are instructive. Both had orders of protection in place—though Ms. Howell's was augmented by the mandatory arrest provision of the DVIA. The officers in both cases knew of the offender's violent tendencies. The responses to Ms. Sorichetti— it's 'only a piece of paper' that 'means nothing,' " 'wait outside,' " and " 'go home' " (*Sorichetti*, 65 NY2d at 466, 471—are exactly the sort of statements the Appellate Division cited to contend that Ms. Howell could not justifiably rely on the police.

Are we to allow individual officers, by disobeying the law and threatening to arrest the victim holding an order of protection, to render reliance on the law unjustifiable? Sadly, that is precisely what the majority holds: had the officers unequivocally said, "you can rely on us to follow the law and arrest Mr. Gaskin, and you will be safe," Ms. Howell's case could proceed, but because the officers said, "we will disregard the law and you are on your own," her case must fail. Police officers have discretion in how they choose to enforce the laws. Should they now be given discretion to write laws out of existence?

The majority quotes *Mastroianni* (a case in which we upheld a money damage award against the police for failing to protect the victim) for the proposition that the "mere existence of an order of protection, standing alone, will not prove justifiable reliance" (majority mem at 4). The events in *Mastroianni* took place a decade before the legislature acted to require the police to arrest violators of domestic violence orders of protection, without exception. The order of protection here does not stand alone; it is accompanied by forceful and unambiguous legislative action, taken in response to countless events like those in *Mastroianni*. Indeed, this case does not even call on us to decide whether the violation of the mandatory arrest statute creates a rebuttable presumption of reliance or conclusive proof of reliance; either would be enough to defeat the City's motion for summary judgment.

The majority insists that the legislature could not have intended to impose liability for police failure to comply with the DVIA's mandatory arrest provision because, "[g]iven the numbers above, the cost of potential municipal liability regarding violations of orders of protection would far exceed the [$500,000 appropriated by the legislature] and would have a significant impact on municipal finances" (majority mem at 5). I have three responses to the majority's argument. First, the calculation by the budget office in 1994 (including that the bill would have no "fiscal implications" for local municipalities) of the expected cost of the legislation surely did not assume that officers would violate the statute by disobeying the mandatory arrest requirement. The budget office estimate measured the cost of the legislation if obeyed, not if flouted. Second, the 195,000 domestic violence

orders of protection issued since 2011 will impose no liability on municipalities unless: (a) the subject of an order violates it; (b) the police disregard the mandatory arrest law; (c) injury proximately follows from the police inaction; and (d) governmental function immunity does not bar recovery even when a special duty is established (on this last point, *see* majority mem at 2 n 1).  Third, the legislative history cited by the majority does not support its conclusion.  Immediately below the statements cited by the majority appears the following: "The longer term State operations impact for the above agencies . . . will depend on felony arrest activity. . .  Unfortunately, the criminal justice sector could not provide any estimates of workload impact" (Bill Jacket, L 1994, ch 222 at 38).  Thus, the legislature acknowledged that the budget office's cost estimate was underinclusive. Additionally, during the statewide hearings the legislature held while drafting the DVIA, Senator Saland, the bill's sponsor, questioned the City of Buffalo Police Commissioner about expenses associated with the "instances in which the defendants or respondents have started litigation charging false arrest" after their cases were dismissed for lack of a true complainant (11/23/1993 Domestic Violence Hearing, 59). Asked whether he had "a suggestion … that might enable us to create a mechanism that shields your department, your officers and parole officers from having to place themselves, or be placed in that situation where they [effect a mandatory arrest required by law] and then they and their municipality find themselves subject to the lawsuit?", the Commissioner agreed that "something to protect the police officers would be very, very important" (*id.* at 61), but distinguished between liability arising from "our number one concern that . . .  no action having been taken, the officers leave that scene and then the victim is assaulted further or

in the worst case obviously we've had homicides as a result of this so, you know, the issue of any kind of physical harm or serious physical injury to the victim would be very, very important," and liability arising from the concern that officers "will not be criticized for making a bad arrest or that there is a liability issue of making a false arrest coming against the officer" (*id.* at 61-62). Senator Saland responded that they were "looking, contemplating, there is nothing in the bill that addresses it now, but something akin to the language that's in the Social Service Law that deals with mandatory report, providing them with, in effect, a good faith immunity for basically doing what the law requires of them and doing it in a fashion that, if anything, is short of being grossly negligent" (*id.* at 62). Senator Daly noted that the following language "would go far in that way: The police officer shall arrest in the course of his duty" (*id.*). The inescapable conclusion is that the legislature wanted any immunity to incentivize officers to *follow* the law, not to protect them when they failed to do so.

The majority's core argument for disregarding the legislature's decision—we're afraid of the cost—could just as easily be applied to police brutality cases or deprivations of civil rights. The simple answer to that argument is: when governmental entities follow the law, they will face no liability. The courts issued Ms. Howell multiple orders of protection. She reasonably relied on them. The legislature required the police to arrest Mr. Gaskin. She reasonably relied on the statute. Even putting those aside, her statements, taken in a light most favorable to her, establish her reliance.

## VII

I offer one final observation. In *Ferreira*, we held that police officers planning or executing a no-knock warrant owe a special duty to all those inside the targeted premises. That includes people within the premises as to whom probable cause exists to arrest them, some of whom pose such a threat to the police that a no-knock warrant is required. If the police plan or execute the raid negligently, any person within the premises, including the violent criminal dreaded by the police, may recover money damages from the government. Here, the majority holds that a *victim* of domestic violence, granted special protections by the courts and legislature, may not recover damages when officers violate the law. The genius of the common law is that it does not require that outcome, but allows our court to adjust the common law doctrines of negligence and special duty as fairness and justice require.

RIVERA, J. (dissenting):

> "[The police officers said] what's going on now. . . . I said look at what he's doing. He did this to my door and look. I said I don't know what -- he's calling me all types of names and everything and he's trying to bust in. [The officer] said how many times you going to keep calling us. Why don't you move.

Why don't you go and stay somewhere else if this keep[s] happening. . . .

"I said I don't have no place else to be. This is my apartment and even if his apartment is upstairs if he's not supposed to be here or come down to my floor the order of protection says. Well, show me again. I said Miss, I told you the other day he ripped it. They said it's my business to go down and get another order of protection. I had to go to my domestic violence worker and ask them for another copy of it."

In her own words, plaintiff Dora Howell describes how she sought police protection on multiple occasions from a physically and emotionally abusive ex-boyfriend. The police did not arrest him, even though he was in violation of multiple judicially-issued orders of protection to stay away from plaintiff. He eventually pushed her out of a third-story window. It is an all too familiar scenario of intimate partner violence and failed law enforcement. Plaintiff then turned to our civil torts system for justice. The majority concludes that she cannot pursue a negligence action against defendant officers and the City of New York because they had no duty to protect her. That holding is incomprehensible.

By law, New York police officers must arrest persons who violate an order of protection issued in cases involving former or current intimate partners (*see* CPL 140.10 [4] [b]). Plaintiff secured eight such orders against her ex-boyfriend, Andre Gaskin. No one disputes that she did what the law required when she petitioned and persuaded the courts that she needed judicial protection against him. When Gaskin violated these judicial orders by repeatedly contacting plaintiff, threatening her, and physically attacking her, plaintiff called the police for help and asked them to enforce those orders. In this action

she alleges that defendants New York City Police Department (NYPD) Officers Mosely-Lawrence and Meran negotiated with Gaskin to leave the premises rather than arrest him as the law required, and that they told her she should move out of her apartment.

Plaintiff further alleges that, after several visits, the officers eventually told her that if she called again, they would arrest her. Unsurprisingly, Gaskin was undeterred by the police, and one day during a violent bout, he pushed plaintiff out of his third-floor apartment building window. She survived. When the same officers who had failed to arrest Gaskin arrived at the scene, they told her that "she should have listened" to them and moved out. The officers' reproach of plaintiff is shocking. I thought we were done with the days of blaming the victim, but I digress.

This appeal is a cautionary tale of the continued failures of our legal system to effectively address intimate partner violence and protect survivors, made worse by the majority decision. If, as the majority concludes, plaintiff cannot pursue her claims and test her allegations in court because the officers made it clear that they would not comply with the law, then how can—and why should—survivors trust our legal system? I disagree with the majority that our courts provide plaintiff with no recourse. Plaintiff has set forth a viable claim for negligence based on the officers' alleged misconduct and defendants have failed to meet their burden of showing on their motion for summary judgment that they did not owe her a duty under the facts alleged in her complaint. Of course they owed her a duty— the legislature has said so.

I.

Intimate partner violence[1] affects people from all walks of life, regardless of economic status, race, ethnicity, or gender identity (*see e.g.* National Domestic Violence Hotline, *Domestic Violence Statistics*, https://www.thehotline.org/stakeholders/domestic-violence-statistics/ [last visited Nov. 8, 2022]). It includes physical, psychological, economic, sexual, and emotional abuse (*see* Matthew J. Breiding et al., National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, *Intimate Partner Violence Surveillance: Uniform Definitions and Recommended Data Elements* at 11-17 [2015], available at https://www.cdc.gov/violenceprevention/pdf/ipv/intimatepartnerviolence.pdf). While advocates have described the experiences of victims, it is the voices of survivors that most pointedly reveal the toll of this violence:

> "Five years ago, when my life as a victim of violence in my home became public, people seemed so surprised that a man of my former husband's prominence could be guilty of physically and emotionally abusing his wife and children. There were those who felt I must have 'done something' to deserve the 17

---

[1] Unless contained in a direct quote or citation, I use the term "intimate partner violence" rather than "domestic violence" to refer to violence between former or current intimate partners. As I explained almost 30 years ago:

> "The term 'domestic violence' is a misnomer because it suggests that violence that occurs in the home or among family members belongs in a different category than other forms of violence, or is of a distinctly private nature. Historically, such beliefs have acted to insulate violence against women from state intervention and from rigorous law enforcement and judicial scrutiny" (Jenny Rivera, *Domestic Violence Against Latinas by Latino Males: An Analysis of Race, National Origin, and Gender Differentials*, 14 BC Third World LJ 231, 232 n 5 [1994]).

years of black eyes, bruises, a broken ear drum, and, yes, also being beaten while I was pregnant with one of my six children. Also, they felt that perhaps I had done something to deserve the endless hours of belittlement and criticism that became a pattern of rigid threatening control from the early days of our relationship. I will be honest, I certainly wanted the same myself, for guilt was constantly reinforced by my husband.

"I wonder why people look for reason to justify violence in the home. I think perhaps for some it is incomprehensible that a wife and child is not safe in their home" (US Senate, Comm on Judiciary, *Domestic Violence: Violence Against Women*, Hearing on Legislation to Reduce the Growing Problem of Violent Crime Against Women, 101st Cong, 2d Sess, Dec. 11, 1990 part 2 at 88-89).

"When I left, I left everything I owned and loved. For years my children and I lived below poverty and experienced great sacrifice, all in the name of living free from violence.

"It took 10 years for me to rebuild my life after leaving and 20 years for me to come before you today with my story" (US House, Comm on Judiciary, Subcomm on Crime & Criminal Justice, *Domestic Violence: Not Just a Family Matter*, Hearing, 103d Cong, 2d Sess, June 30, 1994 at 11).

"There's no worse emotion, I think, than fear. When you hear yelling through the walls, it's a helpless feeling. I was never abused, but the fear it created in my life is something that I'll never forget" (Claudine Dombrowski, *Joe Torre – The 'fear' was the worst – Growing Up with Domestic Violence*, YouTube [Mar. 25, 2009], https://www.youtube.com/watch?v=zite2v5UdqU).

"The first time I went to the hospital [he] had broken my nose and cut my head open. He hit me on the head with a wooden clothes hanger and I got seventeen stitches over my ear. I can't hear well on that side since that happened. The other time, I was pregnant with my third boy. . . . [He] hit me and kicked me so that I almost miscarried in my sixth month. You know, [my son] has always been a slow learner and I think it's because of the beating before he was born" (*Domestic Violence*

*Against Latinas* at 235 n 21, quoting Myrna M. Zambrano, Mejor Sola Que Mal Acompanada 140 [1985]).

"My mom didn't believe me—when I told her she didn't believe that she—her reaction was that doesn't happen with other women. Women don't do that to each other. And I think it took her actually seeing me bruised to have her realize the yeah, I wasn't just blowing this out of proportion. It hurt. It made me feel like she didn't believe what I was telling her. When I called her and asked her to come over and get me because [my partner] had hurt me, she stopped at a sewing machine place on the way because she had an errand to run. So, I mean that—that, I think hurt more than [my partner's] fist" (Mikel L. Walters, *Straighten Up and Act Like a Lady: A Qualitative Study of Lesbian Survivors of Intimate Partner Violence*, 23 J Gay & Lesbian Soc Servs 250, 259 [2011]).[2]

As the above testimonials make clear, in addition to physical, psychological, and emotional harm, intimate partner violence has wide-ranging social effects, impacting employment (*see e.g.* Pamela C. Alexander, *Childhood Maltreatment, Intimate Partner Violence, Work Interference and Women's Employment*, 26 J Family Violence 255 [2011]); housing stability (*see e.g.* Joanne Pavao et al., *Intimate Partner Violence and Housing Instability*, 32 Am J Preventative Med 143 [2007]); and even the lives of future generations (*see e.g.* Megan R. Holmes et al., *Economic Burden of Child Exposure to Intimate Partner Violence in the United States*, 33 J Family Violence 239 [2018]).

---

[2] Additional survivor and advocate accounts can be found in the sources cited above.

II.

A.

Survivors of intimate partner violence and their advocates have spent decades requesting that law enforcement and the judicial system treat intimate partner violence like a crime of public concern rather than a private matter (*see e.g.* Susan Schechter, Women and Male Violence: The Visions and Struggles of the Battered Women's Movement 157-174 [1982]; Eve S. Buzawa & Carl G. Buzawa, Domestic Violence: The Criminal Justice Response 89-124 [3d ed 2003]; Elizabeth M. Schneider, Battered Women & Feminist Lawmaking 20-23 [2000]; Jeannie Suk, *Criminal Law Comes Home*, 116 Yale LJ 2, 11-17 [2006]; Tara Urs, *Coercive Feminism*, 46 Colum Hum Rts L Rev 85, 92-107 [2014]). In the mid-twentieth century, "[f]eminist activism around issues of domestic violence was highly diffuse and took many different forms" (Battered Women & Feminist Lawmaking at 20-21). As part of that activism, advocates "worked legislatively to see that wife beating was treated as a crime—a social, not a private matter" (Women and Male Violence at 159; *see e.g.* Charlotte A. Watson, A Look Back on Our 40-Year Walk, and a Glimpse Ahead, in Appellate Division, First Department, and New York State Judicial Committee on Women in the Courts, Lawyers' Manual on Domestic Violence: Representing the Victim at 18-30 [Mary Rothwell Davis et al. eds., 6th ed 2015], available at http://ww2.nycourts.gov/sites/default/files/document/files/2018-07/DV-Lawyers-Manual-Book.pdf; Sally Goldfarb, *The Civil Rights Remedy of the Violence Against Women Act: Legislative History, Policy Implications & Litigation Strategy: A Panel Discussion Sponsored by the Association of the Bar of the City of New York, September 15, 1995*, 4 JL

& Pol'y 391, 391-397 [1996]; Urs at 93-99; *see also e.g.* Elizabeth M. Schneider, *The Violence of Privacy*, 23 Conn L Rev 973, 977 [1991]).[3] Over time, those advocates raised social consciousness about the devastating effects of violence between intimate partners— on survivors, their families, and our society (*see e.g.* Elizabeth M. Schneider, *Domestic Violence Law Reform in the Twenty-First Century: Looking Back and Looking Forward*, 42 Fam L Quarterly 353, 354-356 [2008]).

> "Today, we have a greater understanding of the dynamics of abusive relationships, and how institutional gender bias heightens the barriers that survivors of domestic violence face, increasing the risk of harm to them and their children. Increased appreciation and concern for the challenges faced by survivors comes after decades of advocacy demanding, among other things, a change in the culture of law enforcement and just treatment in the courts" (*Cole v Cole*, 35 NY3d 1012, 1015 [2020, Rivera, J., dissenting]).[4]

---

[3] The advocacy surrounding intimate partner violence was not monolithic; many advocates raised concerns about expansive criminal law intervention on ideological and practical grounds (*see e.g.* Jenny Rivera, *Creating an Intimate Partner Violence Against Women Legal Theory*, 8 NYC L Rev 495, 498 [2005]; Jenny Rivera, *The Violence Against Women Act and the Construction of Multiple Consciousnesses in the Civil Rights and Feminist Movements*, 4 JL Pol'y 463, 505 [1996]; Miriam H. Ruttenberg, Note, *A Feminist Critique of Mandatory Arrest: An Analysis of Race and Gender in Domestic Violence Policy*, 2 J Gender & L 171, 180-187, 191-194 [1994]; Kimberle Crenshaw, *Mapping the Margins: Intersectionality, Identity Politics, and Violence Against Women of Color*, 43 Stan L Rev 1241, 1245-1250 [1991]). These advocates did not argue that the police should fail to enforce orders of protection secured by a survivor. To the contrary, they argued that lax enforcement was an inherent danger to survivors (*see e.g.* Women and Male Violence at 178; Urs at 96).

[4] *See also Report of the New York Task Force on Women in the Courts*, 15 Fordham Urb LJ 11, 28-50 (1986-1987); Hon. Judith S. Kaye and Susan K. Knipps, *Judicial Responses to Domestic Violence: The Case for a Problem Solving Approach*, 27 W St U L Rev 1 (2000); Lynn Hecht Schafran, *There's No Accounting for Judges*, 58 Alb L Rev 1063 (1995); Women and Male Violence at 161-169; Hon. Jonathan Lippman, *Ensuring Victim Safety and Abuser Accountability: Reforms and Revisions in New York Courts' Response*

Both the federal and the state governments have enacted legislation that protects survivors of intimate partner violence, under both civil and criminal law frameworks, and ensures funding for various forms of services and government interventions. At the federal level, Congress enacted the Violence Against Women Act of 1994 (VAWA; Pub L 103-322, tit IV, 108 Stat 1796, 1902), which made interstate intimate partner violence a crime (*see* 18 USC §§ 2261-2266). Congress also enacted a comprehensive scheme of grant programs, including a program designed to encourage mandatory arrests for the purposes of "improv[ing] the criminal justice response to domestic violence, dating violence, sexual assault, and stalking as serious violations of criminal law, and . . . seek[ing] safety and autonomy for victims" (34 USC § 10461 [a]).[5] New York preceded the federal government in enacting the Domestic Violence Prevention Act (DVPA) in 1987, declaring that "the development and funding of programs providing emergency intervention, shelter, and assistance to victims of domestic violence is of major importance to this state" and that such programs were "experiencing severe financial difficulties due to inadequate levels of

---

*to Domestic Violence*, 76 Alb L Rev 1417, 1420-1422, 1435-1437 (2012-2013). Our court system now better recognizes the devastating effects of intimate partner violence and judges and prosecutors receive training and education on intimate partner violence (*see e.g.* NY State Unified Court System Domestic Violence Workplace Policy, available at https://ww2.nycourts.gov/sites/default/files/document/files/2018-06/dvp.pdf; Rules of Chief Judge [22 NYCRR] § 17.4 [requiring domestic violence training for certain judges]; *Legal Training*, Manhattan Dist Attorney's Office, https://www.manhattanda.org/careers/legal-training/ [last visited Nov. 7, 2022]).

[5] Following VAWA's passage, there was additional advocacy to fund various VAWA programs in Congress (*see* Patricia Schroeder, *Stopping Violence Against Women Still Takes a Fight: If in Doubt, Just Look at the 104th Congress*, 4 JL & Pol'y 377 [1996]).

state, local, and private funding," putting them "at risk of permanent closure" (DVPA, L 1987, ch 838, § 1; *see also* Hon. Karen Burstein, *Naming the Violence: Destroying the Myth*, 58 Alb L Rev 961 [1995] [discussing pre-DVPA legislation in New York]). The DVPA requires local governments to provide shelter and social services for survivors, and establishes funding for such services (*see* Social Services Law §§ 459-b; 459-c).

New York State and New York City have also passed laws to protect the legal rights of survivors. Both the State and City Human Rights Laws treat survivors as a protected class. In 2001 and 2003, New York City amended its Human Rights Law to prohibit employment discrimination based on domestic violence status and to require reasonable accommodations for survivors (*see* NY City Human Rights Law [Administrative Code of City of NY] former § 8-107.1; Local Law No. 75 [2003] of City of New York; Local Law No. 1 [2001] of City of New York). The City Council found that "a growing body of evidence has documented the devastating impact of domestic violence on the ability of victims—over 90% of whom are women—to participate fully in the economy" (Local Law No. 1 § 1). The Council was concerned that "[b]ecause [survivors] are embarrassed or because they fear losing their jobs, [they] are often reticent about informing their employers about incidents of domestic violence or about requesting simple accommodations that might assist them in fulfilling their job duties" (*id.*; *see also* Rep of Human Servs Div, Comm on Gen Welfare & Comm on Women's Issues at 3, NY City Council Prop. Int. No. 400-A [2000]). The Council added a reasonable accommodation provision to bolster survivors' employment rights (*see e.g.* Rep of Governmental Affairs Div, Comm on Gen Welfare, NY City Council Prop Int. No. 107-A [Dec. 12, 2003]). The City expanded that

antidiscrimination provision in 2016 to protect survivors from discrimination in housing (*see* NY City Human Rights Law former § 8-107.1; Local Law No. 38 [2016] of City of NY).[6]

Likewise, in 2009, the state legislature adopted an amendment to the State Human Rights Law prohibiting discrimination in employment on the basis of domestic violence status (*see* Executive Law § 296 [1] [a], [22] [c]; L 2009, ch 80). Like the City Council, the State legislature recognized that survivors were "reluctant" to inform their employers of the need for accommodations because "[i]t is not unusual for a victim of domestic violence to be terminated from [their] job or demoted because [they] need[ ] time of[f] or flexible hours as a protective measure" (Senate Sponsor's Mem in Support, Bill Jacket, L 2009, ch 80 at 8; *see e.g.* Mem of Off for the Prevention of Domestic Violence, Bill Jacket, L 2009, ch 80 at 20; Mem of Natl Org for Women, Bill Jacket, L 2009, ch 80 at 30). In 2022, the legislature expanded those protections to outlaw discrimination on the basis of domestic violence status in public accommodations, housing, education, and business transactions (*see* Executive Law § 296 [1]-[2-a], [3-b]-[5], [9], [13], [22] [a]-[b], as amended by L 2022, ch 202; Senate Sponsor's Mem in Support, L 2022, ch 202; Press Release, Governor Kathy Hochul, Governor Hochul Signs Legislation Protecting Victims of Domestic Violence [May 13, 2022], https://www.governor.ny.gov/news/governor-hochul-signs-legislation-protecting-victims-domestic-violence).

---

[6] Both provisions have since been recodified (*see* NY City Human Rights Law § 8-107 [27] [a], [e]-[f]).

Additionally, various criminal statutes have been enacted or amended to address violence against current or former intimate partners (*see e.g.* Penal Law §§ 120.00; 120.05; 120.10; 120.13-120.15; 120.45-120.60; 135.00-135.30; *see generally* 11 Joel R. Brandes, Law and the Family New York § 86:15 at 646-648 [2022-2023 ed]). Time and again, legislatures have expanded these protections and the definition of "domestic violence," and eventually extended the law's coverage to same sex partners (*see* Social Services Law § 459-a). Each time, the legislature acted in response to the experiences of survivors. For example, in 1994 the legislature gave family and criminal courts concurrent jurisdiction over many offenses and authorized them to issue orders of protection, a change intended to bring New York in line with other jurisdictions and ensure that "individuals who commit violent acts" would not "escape criminal prosecution whenever the victim seeks civil redress" (Letter from Assemblyperson Helene E. Weinstein, Bill Jacket, L 1994, ch 222 at 10; *see* CPL 530.11-530.12; Family Ct Act §§ 812, 842).

B.

These legislative efforts provide express legal protections to survivors. But, the law is only effective if followed. Following the enactment of these legislative protections, much advocacy sought to ensure that they were actually carried out on the ground. One area of particular concern identified by survivors and advocates was lax police enforcement of orders of protection. In the 1990s, advocates described "[t]he failure to enforce orders of protection once they have been granted [as] perhaps the weakest link in the legal safeguards now available to battered women" (US Senate, Comm on Judiciary, *Domestic Violence:*

*Violence Against Women*, Hearing on Legislation to Reduce the Growing Problem of Violent Crime Against Women, 101st Cong, 2d Sess, June 20, 1990 part 1 at 71 [statement of NOW Legal Defense and Education Fund]). One survivor who testified before the United States Senate Judiciary Committee in the lead-up to the passage of VAWA explained that although she called the police "several times," the police "refused to arrest" her abuser (US Senate, Comm on Judiciary, *Domestic Violence: Violence Against Women*, Hearing on Legislation to Reduce the Growing Problem of Violent Crime Against Women, 101st Cong, 2d Sess, Dec. 11, 1990 part 2 at 99). Advocates in New York described police indifference to violations of orders of protection as a "trivialization of the single greatest cause of injury to women in this society" (Letter from Ilene Leopold Persoff, Bill Jacket, L 1994, ch 222 at 116). As one advocate and service provider explained during a State Senate hearing:

> "Many of [the women who come for services] don't even go for orders of protection because the[ ] [police] said basically it's a piece of paper, and the only way you can get help is actually for the abuser to come after them again and to threaten either themselves . . . or their children" (NY Senate, Comm on Children & Families, Public Hearing on the Revision of New York State's Laws Pertaining to Domestic Violence, Nov. 29, 1993 at 14-15).

The New York State legislature adopted a strategy to address this issue with the intended purpose of ensuring the aggressive enforcement of criminal laws expressly enacted to protect survivors and their families (*see e.g.* Senate Introducer's Mem in Support, Bill Jacket, L 1994, ch 222 at 24). Before 1994, there was no statewide uniform arrest policy to guide officers in situations where a person violated an order of protection

obtained by a current or former intimate partner; police departments and individual officers had discretion over arrests. That ended with the enactment of the Domestic Violence Intervention Act (DVIA), which adopted mandatory arrest into New York law.[7] In particular, the DVIA provides that "a police officer shall arrest a person, and shall not attempt to reconcile the parties or mediate, where such officer has reasonable cause to believe that . . . a duly served order of protection . . . is in effect" directing the person to stay away from another (CPL 140.10 [4] [b]).[8]

---

[7] Advocates of mandatory arrest policies relied on early research into intimate partner violence, particularly the Minneapolis Domestic Violence Experiment (Lawrence W. Sherman & Richard A. Berk, The Minneapolis Domestic Violence Experiment [Police Foundation Reports 1984], available at https://www.policinginstitute.org/wp-content/uploads/2015/07/Sherman-et-al.-1984-The-Minneapolis-Domestic-Violence-Experiment.pdf) and several replication studies (*see* Buzawa & Buzawa at 98-104).

[8] Some police departments in New York—including the NYPD—had adopted mandatory arrest policies prior to the DVIA's enactment (*see e.g. Bruno v Codd*, 47 NY2d 582, 590 [1979]; Letter from Rudolph W. Giuliani, Mayor of City of NY, Bill Jacket, L 1994, ch 222 at 193). Prior to 1996, the City did not adopt a system for "uniform reporting of domestic violence incidents by NYPD" (Mary Haviland et al., Family Violence Project, Urban Justice Center, The Family Protection and Domestic Violence Intervention Act of 1995: Examining the Effects of Mandatory Arrest in New York City at 14 n 3 [May 2001], available at https://www.researchgate.net/publication/314857235_The_Family_Protection_and_Domestic_Violence_Intervention_Act_of_1995_Examining_the_Effects_of_Mandatory_Arrest_in_New_York_City_A_REPORT_BY_THE_FAMILY_VIOLENCE_PROJECT_OF_THE_URBAN_JUSTICE_CENTER_AUTH; *see also* Adriana Fernandez-Lanier et al., New York State Division of Criminal Justice Services, *Domestic Violence: Research in Review* at 2 n 3 [May 2002], available at https://www.criminaljustice.ny.gov/crimnet/ojsa/domviol_rinr/19972000dir_report.pdf), However, independent researchers found that, notwithstanding the City's mandatory arrest policy, arrest rates for intimate partner violence were low (*see* Ariella Hyman et al., *Laws Mandating Reporting of Domestic Violence: Do They Promote Patient Well-being?*, 273 JAMA 1781, 1784 [1995] ["Studies in San Francisco and New York City revealed that in 1991, only 25% to 30% of domestic violence calls to the police resulted in written reports required by law, and only 7% to 12% resulted in arrest"]).

The judicial branch has done its part to educate the public and the bar. Since 1995, the First Department and the Judicial Committee on Women in the Courts have published and updated the Lawyers' Manual on Domestic Violence, a handbook covering dozens of topics for attorneys representing survivors of domestic violence. In the foreword to the latest edition, former Chief Judge Lippman recognized that the "education and commitment" of various groups—including judges and attorneys—"is critically needed if we are to continue to make progress in combatting the terrible problem of domestic violence" (Hon. Jonathan Lippman, Foreword, in Lawyers' Manual on Domestic Violence). Today, the Unified Court System website succinctly explains the State's mandatory arrest law:

> "New York State has 'mandatory arrest" for domestic violence cases. This means that in an intimate partner relationship the police must make an arrest when . . . [a] person disobeys an order of protection by making contact when there is a stay away order. . . . In mandatory arrest cases, even if you ask the police not to make an arrest, they must do so. . . . A mandatory arrest does not always happen right away. It means that the police must make an arrest even if the abuser leaves before the police arrive. Whenever the police investigate domestic violence, they must give the victims written notice of their legal rights" (New York State Unified Court System, *Criminal Domestic Violence Cases*, NY CourtHelp, https://www.nycourts.gov/courthelp/Safety/criminalDVcases.shtm [last visited Nov. 7, 2022]).

## C.

Despite increased legislative efforts to protect survivors, law enforcement still lags behind (*see e.g. Domestic Violence Law Reform* at 358). According to a 2015 report by the National Domestic Violence Hotline, one in three survivors of domestic violence felt less

safe after calling the police, one in two believed that the police made no difference to their

safety, and one in four reported that police had threatened them with arrest when they called

(*see* TK Logan & Rob Valente, National Domestic Violence Hotline, *Who Will Help Me?*

*Domestic Violence Survivors Speak Out About Law Enforcement Responses* at 6, 8 [2015],

available at http://www.thehotline.org/wp-content/uploads/sites/3/2015/09/NDVH-2015-

Law-Enforcement-Survey-Report.pdf). Likewise, a 2015 report by the American Civil

Liberties Union referenced service providers' statements that their clients feared police

responses to intimate partner violence. Representative of other reports, one provider stated

that:

> "The majority of [their] clients who need law enforcement
> assistance will call once, but not twice. Their first experience
> usually turns them off to the police as a form of help. Clients
> have reported insensitive comments ranging from 'didn't you
> think this was going to happen?' to 'what did you do to make
> him so mad?', but more commonly they tell me that they call
> the police to report violations of restraining orders and are told
> 'there is nothing we can do' or 'you'll have to go to court and
> tell the judge' " (Donna Coker et al., American Civil Liberties
> Union, *Responses from the Field: Sexual Assault, Domestic
> Violence, and Policing* at 14 [Oct. 2015], available at
> https://www.aclu.org/sites/default/files/field_document/2015.
> 10.20_report_-_responses_from_the_field_0.pdf).

Some officers do not fully appreciate—and others simply refuse to acknowledge—that

"domestic violence" is as serious as other violent crimes or that survivors are crime victims,

entitled to the protections the law affords. As survivors have recounted:

> "When my ex entered the house, my daughter was awake. I
> heard an argument. I came into the living area to try and calm
> her down. Her eyes were wide with fear—she could see him
> approaching with a gun. When I turned around shots rang. I

managed to dial 911. I couldn't talk because [my face] was shot up, but they traced the call home. The police came, then the medical team.

"I heard a policeman say, 'Oh this is just a domestic violence case.' He was just five feet from where I was fighting for my life and where my child lay dead. There was nothing 'just' about it" (*These women survived domestic violence. Now they're taking a stand to help others*, Amnesty Intl [Oct. 24, 2019], https://www.amnesty.org/en/latest/news/2019/10/gun-violence-report/).

"I called the police, uh, you know the second squad car comes, and the officer walks down, and he goes, 'It's just a couple of dykes, whatever,' and they walk off. I get to the police station and they call me Charlize Theron, because I had straggly blond hair at the time, and I'd had the crap beat out of me, and I pretty much looked like her from the movie 'Monster.' And then, the way they treated us during the interviews and stuff, it was just so different from anything I'd ever seen or experienced. And it was like, we were beyond second class" (Jeanne L. Alhusen et al., *Perceptions of and Experience With System Responses to Female Same-Sex Intimate Partner Violence*, 1 Partner Abuse 443, 450 [2010]).

The allegations in plaintiff's complaint and in her testimony hark back to the bad old days before our social enlightenment about how cultural gendered norms can encourage violence against intimate partners, and the familiar blame-the-victim refrain that survivors "should have known better." The majority's decision also echoes the past (*see e.g.* majority mem at 3-4 [blaming plaintiff for Gaskin's assault and faulting her for failing to "relax her vigilance"]).[9]

---

[9] As Judge Wilson notes, "learned helplessness is a common and predictable response to [intimate partner violence]" (Wilson dissenting op at 8 n 3). Another common response to intimate partner violence is posttraumatic stress disorder, which causes a constant state of vigilance and fear (*see e.g.* Erica L. Birkley et al., *Posttraumatic Stress Disorder*

III.

My dissenting colleague Judge Wilson has thoroughly set forth the facts as alleged in the complaint and the procedural history of this litigation (*see* Wilson dissenting op, parts I-II). I have nothing to add to his summary. Although I disagree with Judge Wilson that plaintiff preserved a claim based on a private right of action for breach of a statutory special duty under the DVIA (*see id.*, part III),[10] I agree with my colleague that under existing precedent as applied by our Court, Supreme Court properly denied defendants' motion and plaintiff's action should have been allowed to go forward (*see id.*, part VI.B). Thus, I join his dissent fully with respect to those matters. I write separately because the special duty test applied by the majority is designed for cases of individual discretionary action, not where the officers—by legislative fiat—have no discretion. The majority's mechanical application of the special duty test simply fails to square with the officers' legislatively-imposed obligation to arrest Gaskin once they were informed that he violated plaintiff's orders of protection.

---

*Symptoms, Intimate Partner Violence, and Relationship Functioning: A Meta-Analytic Review*, 29 J Traumatic Stress 397 [2016]).

[10] I also do not join Judge Wilson's dissent to the extent that he opines that plaintiff should be allowed to proceed on the theory that a special duty arose because the City assumed positive direction and control in a dangerous situation (*see* Wilson dissenting op, part VI.A). Plaintiff does not assert that special duty theory before this Court. Thus, whether or not that theory was pleaded in plaintiff's complaint, it has been abandoned (*see e.g. JF Capital Advisors, LLC v Lightstone Group, LLC*, 25 NY3d 759, 766 n 2 [2015]).

Plaintiff had two paths in her action against defendants; both turned on the officers' failure to arrest Gaskin. She could have (1) asserted a private right of action under the DVIA and, in the alternative, she could have (2) alleged that the City owed her a special duty under the facts of her case. Plaintiff's complaint did not explicitly allege a violation of the DVIA as a basis for relief, and even under our liberal pleading standards—which require we draw all reasonable inferences in her favor—her complaint, as written, cannot be read as advancing such a claim (*see Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v Matthew Bender & Co., Inc.*, 37 NY3d 169, 175 [2021]).[11]

As to the alternative path, there is no dispute that plaintiff's complaint asserts a claim that, on the facts as alleged, defendants had a special duty to protect her against Gaskin. Defendants' motion for summary judgment[12] on this special duty claim required them to "make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact" (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]; *accord Jacobsen v New York City Health & Hosps. Corp.*, 22 NY3d 824, 833 [2014]). Specifically, they had to establish as a matter of law that, interpreting the facts as alleged in the light most favorable to plaintiff (*see William J. Jenack Estate Appraisers & Auctioneers, Inc. v Rabizadeh*, 22 NY3d 470,

---

[11] This appeal does not present a question as to whether, if requested by plaintiff, Supreme Court should have granted her leave to amend her claim after discovery to include such a claim (*see* CPLR 3025 [b]; *Davis v South Nassau Communities Hosp.*, 26 NY3d 563, 580 [2015]; *Edenwald Contr. Co. v City of New York*, 60 NY2d 957, 959 [1983]).

[12] Defendants also moved pursuant to CPLR 3211 (a) (7) for dismissal of the complaint, which portion of the motion was denied, and is not at issue on appeal.

475 [2013]), they were not liable for plaintiff's injuries because of defendant officers' failure to arrest Gaskin on the numerous occasions he violated an order of protection issued on plaintiff's behalf (*see Alvarez*, 68 NY2d at 324 ["Failure to make (a) prima facie showing requires a denial of the motion, regardless of the sufficiency of the opposing papers"], citing *Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [1985]). Defendants failed to do so.

The majority's conclusion to the contrary is a misapplication of our judicially-formulated special duty doctrine and the underlying policy considerations that animate our precedent. In *Cuffy v City of New York*, this Court set forth a four-factor test for determining whether there is a special relationship between a person and a municipality that gives rise to a special duty:

> "(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking" (69 NY2d 255, 260 [1987]; *accord Pelaez v Seide*, 2 NY3d 186, 202 [2004]).

The doctrine reflects two principles: (1) a municipality owes a duty to the general public, not to any individual—here the general duty to provide protective law enforcement (*see Ferreira v City of Binghamton*, 38 NY3d 298, 309 [2022]; *Valdez v City of New York*, 18 NY3d 69, 75 [2011]; *Florence v Goldberg*, 44 NY2d 189, 195-196 [1978]); and (2) police protection is "a resource-allocating function" best left to the discretion of a municipality (*Cuffy*, 69 NY2d at 260, citing *Weiner v Metropolitan Transp. Auth.*, 55 NY2d 175 [1982];

*see Pelaez*, 2 NY3d at 205). These are justifications for "declin[ing] to hold municipalities subject to tort liability for their failure to furnish police protection to individual citizens" (*Cuffy*, 69 NY2d at 260). As the Court has painstakingly explained, "[w]e have deemed it necessary to restrict the scope of duty in this manner because the government is not an insurer against harm suffered by its citizenry at the hands of third parties" (*Valdez*, 18 NY3d at 75).

The special duty doctrine announced in our case law is a pragmatic response to unlimited liability in those cases where the municipality and its agents have discretion to act. The doctrine presupposes, first, that the municipality need do nothing at all—the municipality may decide not to provide police protection (*see Valdez*, 18 NY3d at 75; *Cuffy*, 69 NY2d at 260). It further presupposes that once the municipality or its agents assume the duty to act on behalf of the injured party in a particular case and acts accordingly, the municipality has knowingly chosen to direct its resources to protect the individual and is therefore subject to tort liability for negligence (*see Valdez*, 18 NY3d at 75; *Cuffy*, 69 NY2d at 260-262; *Sorichetti v City of New York*, 65 NY2d 461, 468-470 [1985]). Those presumptions are misplaced when the government in the first instance promises—or, put another way, enters a form of social compact with New Yorkers—to protect against a category of potential future harm, as when a survivor of domestic violence has informed the police that an order of protection for their benefit has been violated and the law mandates an arrest. In those cases, the municipality and its agent have no choice in

how to act, and an atomized assessment of each individual *Cuffy* factor is unnecessary because the factors are satisfied by the legislative abrogation of officer discretion.[13]

In the context presented here, the legislature removed officer discretion with full knowledge of the removal's impact on local law enforcement resources. The legislature enacted the mandatory arrest policy over law enforcement objections that it would "put another mandate on local government financially which would include additional personnel and overtime" (Letter from Police Conference of NY, Bill Jacket, L 1994, ch 222 at 66; *see also* NY Senate, Comm on Children & Families, Public Hearing on the Revision of New York State's Laws Pertaining to Domestic Violence, Jan. 27, 1994 at 15 [discussing costs of domestic violence arrests in New York City]). Indeed, the State Division of the Budget recognized that although "[the] [DVIA] could result in increased costs for local police departments, . . . it can be argued that the existing negative effects associated with domestic violence already place an emotional and economic burden upon our criminal justice, social service, health care[,] and educational systems," and that "[b]y preventing such destructive impact upon society, the long term benefits . . . outweigh the immediate costs" (Rep of St Div of Budget, Bill Jacket, L 1994, ch 222 at 38; *see also* NY Senate, Comm on Children & Families, Public Hearing on the Revision of New York State's Laws Pertaining to Domestic Violence, Jan. 13, 1994 at 5-6 ["Domestic violence

---

[13] I am not, as the majority suggests, collapsing the special duty and governmental function immunity analysis (*see* majority mem at 2 n 1). Rather, I argue that the legislature's elimination of officer discretion creates an affirmative duty—grounded in this State's policy to prevent violence in intimate relationships—that necessarily directs municipalities to allocate their resources in a particular manner.

. . . costs all of us . . . hundreds of millions of dollars"] [statement of Sen. Saland]).[14] This

legislative choice was a drastic departure from the past, where an officer made an

individual assessment as to the proper response in domestic violence cases. As my

dissenting colleague and I discuss, the legislature deemed the mandatory, nondiscretionary

arrest policy necessary given the recalcitrance of law enforcement to arrest abusers even

when the officers were aware that the abuser has violated a stay-away order of protection

(*see* part II.B, *supra*; Wilson dissenting op, part VI.B).[15]

Given that the principles supporting our prior articulation of the special duty

doctrine and its narrow exception fail to account for the scenario presented in this appeal,

we should realign the doctrine to serve the state's clear legislative objectives. Specifically,

we should make clear that since there is a statewide uniform arrest policy, leaving no room

for discretion by the municipality and its agent, a plaintiff need not establish the

" 'critical' " factor of reliance (majority mem at 3, quoting *Valdez*, 18 NY3d at 81) when

---

[14] The majority's suggestion that the legislature recognized that the DVIA would have "no 'fiscal implications' for local municipalities" (majority mem at 5, quoting Senate Introducer's Mem in Support, Bill Jacket, L 1994, ch 222 at 25) is belied by the balance of the legislative record, in which legislators candidly acknowledged that effecting arrests is a costly exercise.

[15] The majority's fear that "the cost of potential municipal liability regarding violations of orders of protection . . . would have a significant impact on municipal finances" (majority mem at 5) assumes that law enforcement officers routinely ignore the DVIA's mandatory arrest provision. If that is actually the case, then, as Judge Wilson explains, expanding liability here would further another salutary goal of tort law—incentivizing compliance, encouraging adequate training, and deterring bad actors (*see* Wilson dissenting op at 23-24; *see also id.* at 33-35).

officers fail to make arrests in qualifying cases.[16] The doctrine as re-envisioned would advance the legislature's intent to expand the protection of survivors via rigid police enforcement of orders of protection.

## IV.

The legislature's adoption of a statewide mandatory arrest policy withdrew officer discretion and imposed a new municipal duty; combined with its allotment of resources, such measures reflect its intent to ensure that survivors of intimate partner violence are protected by removing officer discretion in individual cases. Plaintiff's complaint alleges that defendants failed in their duty. The majority holding deprives her of the opportunity to establish these allegations. "Unfortunately, due to the majority decision here, legislative action to reinstate the [C]ourt's obligations is the only recourse to ensure survivors are heard" (*Cole*, 35 NY3d at 1024 [Rivera, J., dissenting]).

---

[16] The majority is correct that this Court has held that "[t]he mere existence of an order of protection, standing alone, will not prove justifiable reliance" (majority mem at 4 [internal quotation marks omitted], quoting *Mastroianni v County of Suffolk*, 91 NY2d 198, 205 [1997], citing *Sorichetti*, 65 NY2d at 70). However, in *Mastroianni*, where this Court articulated that rule, the underlying events occurred in 1985, prior to the enactment of the DVIA (*see* 91 NY2d at 201-203), and the Court did not discuss the DVIA in that case. Likewise, *Sorichetti* was decided before the legislature enacted the DVIA.

Order affirmed, with costs, in a memorandum. Acting Chief Judge Cannataro and Judges Garcia, Singas and Troutman concur. Judge Wilson dissents in an opinion, in which Judge Rivera concurs in part in a separate dissenting opinion.

Decided November 22, 2022